**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE NAVAJO NATION** ) | |
| ) | |
| Plaintiff, ) | Lead Case: Civil Action No. 16-cv-0011-TSC |
| ) | |
| ) | Consolidated with: |
| **v.** ) | Civil Action No. 17-cv-0513-TSC |
| ) | Civil Action No. 17-cv-0863-TSC |
| ) | Civil Action No. 18-cv-0774-TSC |
| **UNITED STATES DEPARTMENT** ) | Civil Action No. 19-cv-3612-TSC |
| **OF THE INTERIOR,** *et al.*, ) | Civil Action No. 20-cv-1297-TSC |
| ) | Civil Action No. 21-cv-0013-TSC |
| Defendants. ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

In six consolidated cases (*Navajo Nation II – VII*),[1] Plaintiff Navajo Nation ("the

Nation") alleges that the Bureau of Indian Affairs ("BIA"), an agency within the United States

Department of the Interior ("DOI"), violated the Indian Self-Determination and Education

Assistance Act, 25 U.S.C. § 450 *et seq.* (the "ISDEAA"), by partially declining the Nation's

annual funding requests for operations of its Judicial Branch for the years 2015–2020.  The

---

[1] Lead case *Navajo Nation v. Dep't of Interior, et al.*, No. 16-cv-0011-TSC (D.D.C. Jan. 5, 2016) ("*Navajo Nation II*"), has been consolidated with No. 17-cv-0513-TSC (D.D.C. March 21, 2017) ("*Navajo Nation III*"), No. 17-cv-0863-TSC (D.D.C. May 10, 2017) ("*Navajo Nation IV*"), No. 18-cv-0774-TSC (D.D.C. April 5, 2018) ("*Navajo Nation V*"), No. 19-cv-3612-TSC (D.D.C. December 3, 2019) ("*Navajo Nation VI*"), and No. 20-cv-1297-TSC (D.D.C. May 15, 2020) ("*Navajo Nation VII*").

In a seventh consolidated case, *Navajo Nation v. Dep't of Interior, et al.*, No. 21-cv-13-TSC (D.D.C. Jan. 5, 2021) ("*Navajo Nation VIII*"), neither the Nation nor Defendants have moved for summary judgment.  The court stayed that case on October 7, 2021, pending the outcome of the other six consolidated cases, *Navajo Nation II* through *VII*.  *See* Minute Order, No. 21-cv-13-TSC (D.D.C. Oct. 7, 2021).  As previously ordered, within 45 days of today's Order, the parties shall meet and confer to determine whether they can reach a settlement in *Navajo Nation VIII*. *See id.*  To the extent the parties are unable to do so, they shall file a joint status report with a proposal for moving forward with this case, which shall be accompanied by a proposed order.

Nation also alleges that the BIA unlawfully removed provisions from the Nation's 2019 and 2020 proposed Annual Funding Agreements ("AFAs"). The parties have each moved for summary judgment. Upon consideration of the parties' pleadings, and for the reasons set forth below, the court will GRANT IN PART and DENY IN PART the Nation's motion and will GRANT IN PART and DENY IN PART Defendants' cross-motion.

## I.    BACKGROUND

### A.  <u>Statutory and Regulatory Background</u>

#### 1.  <u>Annual Funding</u>

Congress enacted the ISDEAA in 1975 to empower Indian tribes with responsibility to administer federally funded programs that otherwise would be administered on their behalf by the federal government. 25 U.S.C. § 5301 *et seq.* Under the ISDEAA, tribes and federal agencies memorialize this transfer of authority by entering into a "self-determination contract." *See generally id.* § 5321(a)(1). The terms of the contract define its scope and duration. For example, some self-determination contracts run for an indefinite period. *See* 25 U.S.C. § 5324(c); *Seneca Nation of Indians v. U.S. Dep't of Health & Hum. Servs.*, 945 F. Supp. 2d 135, 136 (D.D.C. 2013). Others, such as those at issue in this case, are confined to a finite contractual period. *See* 25 U.S.C. § 5324(c). In the latter example, a tribe may submit a proposal to renew the self-determination contract, subject to the Secretary's review and approval in accordance with 25 U.S. Code § 5321.

Regardless of their length, self-determination contracts are funded one year at a time, through an annual negotiation process between the tribe and agency. *See id.* §§ 5324(c), 5325(a). Subject to the agency secretary's annual approval, each AFA is incorporated into the self-determination contract. *See id.* § 5329(c).

These six consolidated cases arise from the parties' 2012 self-determination contract, which ran from January 1, 2012, through December 31, 2016, and their renewed 2017 self-determination contract, which ran from January 1, 2017 through December 31, 2021. Specifically, the Nation's claims focus on two AFAs incorporated into the 2012 contract, the 2015 and 2016 AFAs, and four AFAs incorporated into the 2017 contract, the 2017, 2018, 2019, and 2020 AFAs.

Each AFA must provide funds to a tribe at the same level that the agency "would have otherwise provided for the operation of the programs" if the agency had continued to provide the service itself. *Id.* § 5325(a)(1). This is commonly referred to as the "Secretarial amount," which equates to a funding floor. *See Navajo Nation v. U.S. Dep't of Interior*, 852 F.3d 1124, 1130 (D.C. Cir. 2017). There are five circumstances in which the agency may reduce funds below the Secretarial amount, *see* 25 U.S.C. § 5325(b),[2] and the parties agree that none of those exceptions apply here, *see* ECF No. 17, Pl.'s Mot. at 10; ECF No. 19, Defs.' Mot. and Opp'n at 2.

While an agency is restricted from dipping below the funding floor, it may agree to increase the Secretarial amount upon request from a tribal organization. *See Navajo Nation*, 852 F.3d at 1130 ("Secretarial amount is not immutable and can be increased by the Secretary")

---

[2] Section 5325(b) provides that:

> The amount of funds required by subsection (a) of this section [the Secretarial amount] . . . shall not be reduced by the Secretary in subsequent years except pursuant to—
> (A) a reduction in appropriations from the previous fiscal year for the program or function to be contracted [known as an across-the-board reduction];
> (B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;
> (C) a tribal authorization;
> (D) a change in the amount of pass-through funds needed under a contract; or
> (E) completion of a contracted project, activity, or program.

25 U.S.C. § 5325(b)(2).

(citation omitted); *see also* 25 U.S.C. § 5325(b)(5) (providing that the Secretarial amount "may, at the request of the tribal organization, be increased by the Secretary if necessary to carry out this [Act]"); *id.* § 5324(c)(2) ("The amounts of such contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."). The agency may also decline an annual proposal when the amount proposed exceeds the Secretarial amount. *See* 25 U.S.C. § 5321(a)(2)(D).

When a tribe submits a proposed AFA, "the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification" to the tribe that the proposal is declined for one of five reasons provided by the statute, such as that the request exceeds the Secretarial amount. *Id.* § 5321(a)(2). If the agency declines a tribe's AFA, the agency must "state any objections in writing to the tribal organization." *Id.* § 5321(b)(1). The agency may issue a partial declination that approves "a level of funding" at the Secretarial amount as part of the Secretary's power to approve any severable portion of a contract proposal. *Id.* § 5321(a)(4)(B). A proposal that is not declined within 90 days is "deemed approved" and incorporated into the contract. *See* 25 C.F.R. § 900.18.

DOI regulations further prohibit the BIA from declining a tribe's proposed AFA when it is "substantially the same as the prior annual funding agreement." *Id.* § 900.32.

## 2. Contested Language in AFAs

The ISDEAA also establishes procedures for tribes and agencies to annually negotiate certain provisions of their self-determination contracts, beyond just funding levels. Self-determination contracts shall "contain, or incorporate by reference, the provisions of the model agreement described in subsection (c) of this section." 25 U.S.C. § 5329(a)(1). That model

agreement provides, among other things, that the "annual funding agreement under this Contract shall only contain . . . terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment." 25 U.S.C. § 5329(c) (Model Agreement § (f)(2)(A)). Under the model agreement, the only other provisions to be included in AFAs are those "to which the parties agree." *Id.*

**B. *Navajo Nation I***

These cases follow from *Navajo Nation v. Dep't of Interior, et al.*, No. 1:14-cv-01909-TSC (D.D.C. Nov. 12, 2014) ("*Navajo Nation I*"), which involved a dispute over the amount of contract funding for the Nation's judicial system for 2014. In that case, the Nation sought $17,055,517 in their proposed 2014 AFA, an increase of $15,762,985 over the previous year's funding. On October 4, 2013, during a partial government shutdown caused by a lapse in congressional appropriations, the Nation hand-delivered its proposal to a receptionist at the Self-Determination Office in the BIA's Navajo Regional Office. *Navajo Nation I*, 852 F.3d at 1126. Due to the partial shutdown, several BIA employees were furloughed, including the BIA official "responsible for making award and declination decisions for Navajo Nation's contracts under the ISDEAA." *Id.* On October 21, 2013—two business days after normal governmental operations resumed—the BIA sent a letter to the Nation acknowledging receipt of the proposal and stating that "due to the government shutdown, the BIA considered the proposal to have been received on October 17, 2013." *Id.* at 1127. On November 7, 2013, the BIA sent the Nation another letter, this time noting its concerns about the substantial increase in proposed funds, asking the Nation to respond to the BIA's concerns by November 29, 2013, and stating that the BIA would "hold the approval" of the Proposal until the Nation submitted certain documents. *Id.* The Nation did

not respond to either letter. *Id.*

On January 15, 2014, the BIA issued a partial declination approving approximately $1.3 million in funding and declining the Nation's request as to the additional $15,762,985. *Id.*

On November 12, 2014, the Nation filed *Navajo Nation I* to enforce its proposed AFA and receive the full funding that it had requested for 2014. *See Navajo Nation I*, No. 1:14-cv-01909-TSC, ECF No. 1 ¶ 1. The Nation argued that the 90-day clock for responding to its proposal began to run on October 4, 2013, the day it hand-delivered the proposal to the BIA's receptionist, and that the deadline for responding came and went on January 2, 2014 with no response. *Id.* ¶¶ 15, 17-20. The Nation contended that because the BIA's partial declination letter was submitted after the 90-day window had closed, the proposed AFA had been "deemed approved." *See id.* ¶¶ 17-21 (citing 25 C.F.R. § 900.18; 25 U.S.C. § 450(f)(a)(2)). The Nation sought declaratory and injunctive relief, and damages in the amount of $15,762,985. *See id.* ¶ 1. The BIA argued that it was entitled to additional time because of the partial government shutdown, and that the Nation should be equitably estopped from asserting the January 2, 2014 deadline because of its silence in response to the BIA's October 21 and November 7 letters. *Navajo Nation I*, No. 1:14-cv-01909-TSC, ECF No. 18 at 22-27. The court granted the government's motion for summary judgment, holding that the Nation was equitably estopped from enforcing the January 2, 2014, deadline. *Navajo Nation v. Dep't of the Interior*, 174 F. Supp. 3d 161, 171 (D.D.C. 2016), *rev'd sub nom. Navajo Nation*, 852 F.3d at 1124.

On appeal, the D.C. Circuit reversed, holding that equitable estoppel did not bar the Nation's claims, that the BIA received the Nation's proposal on the date it was hand-delivered, and that the BIA's partial declination was thus untimely. *Navajo Nation*, 852 F.3d at 1130. On June 12, 2020, this court entered a final judgment ordering the Nation's proposed AFA for 2014

deemed approved because of the untimely denial and awarding the Nation damages in the amount of $15,762,985. *See Navajo Nation I*, 14-cv-1909-TSC, ECF No. 51. The court also found that the amount of damages was facially reasonable after considering the Nation's contention that the previous funding level was drastically insufficient to meet its needs. *See id.*

### C. *Navajo Nation II – VII*

While the *Navajo Nation I* litigation was playing out, the parties continued to negotiate AFAs pursuant to their 2012 self-determination contract and its successor 2017 contract. Prior to each successive year—2015 through 2020—the Nation sent a proposed AFA to the BIA that sought at least the same amount sought in the 2014 proposal, $17,055,517. ECF No. 17, Pl.'s Statement of Material Facts ("SMF"), Exs. A, D, F, H, J, M. In response to each of those proposals, the BIA issued a timely declination letter pursuant to 25 C.F.R. § 900.22, explaining that the amount sought by the Nation far exceeded the applicable funding level for the respective contract and, thus, the Secretarial amount. *Id.*, Exs. C, E, G, I, K, N.

Six consolidated lawsuits followed. In each, the Nation argues that because the 2014 AFA was deemed approved, the amount of funding the Nation ultimately obtained for 2014— $17,055,517 ($1,292,532 approved by the BIA plus $15,762,985 obtained by court order in the form of damages)—set the new Secretarial amount, *i.e.*, the funding floor, for all subsequent years. The Nation argues that the BIA's refusal to provide annual funding at that level from 2015 to 2020 was unlawful, and it seeks damages amounting to the additional funding that it should have received in each of those years.

In the two most recent cases—*Navajo Nation VI* and *Navajo Nation VII*—the Nation also challenges the BIA's removal of two provisions that the Nation included in its 2018, 2019, and 2020 proposed AFAs.

1. The 2015 AFA (*Navajo Nation II*)

On October 9, 2014, the Nation submitted its proposed AFA for 2015 to the BIA, with a proposed budget of $19,130,869. *Id.*, Ex. A. On January 6, 2015, the BIA partially declined the Nation's proposed 2015 AFA by declining all funding above $1,295,735, the $1,296,448 in funding it sought to provide with its untimely denial in 2014, less an across-the-board reduction of $713 due to a reduction in congressional appropriations.[3] *Id.*, Ex. C. That partial declination is the focus of *Navajo Nation II*.

2. The 2016 AFA (*Navajo Nation III*)

On January 7, 2016, the Nation submitted its proposed AFA for 2016, with a proposed budget of $17,055,477. *Id.*, Ex. D. The BIA partially declined the Nation's proposed AFA for 2016 by rejecting all funding above $1,436,301, explaining that it was declining the funding pursuant to 25 C.F.R. § 900.22(d), which provides that an AFA may be declined if "[t]he amount of funds proposed under the contract is in excess of the applicable funding level for the contract." *Id.*, Ex. E. This partial declination is the focus of *Navajo Nation III*.

3. The 2017 AFA (*Navajo Nation IV*)

On January 11, 2017, the Nation submitted its proposal to renew the 2012 contract for four years, which included a proposed AFA for 2017 of $17,055,477. *Id.*, Ex. F. The BIA partially declined the Nation's proposal by declining all funding above $1,429,177, the 2016 funding it had provided less an across-the-board reduction of $7,124 due to a reduction in congressional appropriations. *Id.*, Ex. G. The BIA asserted that it was declining the funding pursuant to 25 C.F.R. § 900.22(d). This partial declination is the focus of *Navajo Nation IV*.

---

[3] The Secretary is authorized to implement across-the-board funding reductions in response to a reduction in lump sum appropriations by Congress from the previous fiscal year for the program or function to be contracted. *See* 25 U.S.C. § 5325(b)(2)(A).

4.  <u>The 2018 AFA (*Navajo Nation V*)</u>

On September 27, 2017, the Nation submitted its proposed 2018 AFA for the 2017

renewed contract to the BIA, with proposed funding of $17,055,477.  *Id.*, H.  The BIA partially

declined the Nation's proposal by declining all funding above $1,426,547.08, the 2017 funding it

had provided less an across-the-board reduction of $9,753.92 due to a reduction in congressional

appropriations.  *Id.*, I.  The BIA again asserted that it was declining the funding pursuant to 25

C.F.R. § 900.22(d).  This partial declination is the focus of *Navajo Nation V*.

In declining the Nation's request, the BIA also indicated that it had removed certain

language in the Nation's proposed 2018 AFA "in order to comply with the Anti-Deficiency

Act"[4] pursuant to 25 U.S.C. § 5329.  The contested language appeared in sections B and D of the

proposed 2018 AFA as follows:

> DOI acknowledges that the amount allocated does not fully fund the contracted
> activities and to the extent that any shortfall exists in funding (direct, contract
> support costs, or otherwise) owed to the Navajo Nation, the DOI and BIA shall
> make a good faith effort, subject to applicable law, to identify additional funds or
> to obtain an appropriation to address this shortfall. DOI will report such shortfalls
> to Congress and simultaneously provide the Navajo Nation with such report.
>
>     . . . .
>
> If, during the term of this AFA, it is not possible to pay all CSC [contract support
> costs] funds, DOI shall make a good faith effort, subject to applicable laws, to
> identify funds or to obtain an appropriation to address this shortfall.

*Id.*, Ex. H at 4-5.

The Nation does not challenge removal of this language in *Navajo Nation V*; it does,

however, challenge the BIA's removal of the same language in *Navajo Nation VI* and *VII*.

---

[4] The Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A)-(B), "prohibits government officials and
employees from making expenditures or incurring obligations in excess of available
appropriations or in advance of appropriations."  *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442,
1449 (Fed. Cir. 1997).

5. <u>The 2019 AFA (*Navajo Nation VI*)</u>

On October 2, 2018, the Nation submitted its proposed 2019 AFA for the 2017 renewed

contract to the BIA, with proposed funding of $17,055,477. *Id.*, Ex. J. The BIA partially

declined the Nation's proposal by declining all funding above the 2018 level of $1,452,725. *Id.*,

Ex. K. The BIA asserted that it was declining the funding pursuant to 25 C.F.R. § 900.22(d).

In addition, the BIA again objected to the inclusion of language in Sections B and D of

the proposed 2019 AFA. In a December 20, 2018 letter, the BIA announced that, pursuant to 25

U.S.C. § 5329, it would "remove" this language to comply with the Anti-Deficiency Act. *Id.*,

Ex. K. In a separate letter dated December 21, 2018, the BIA stated that it was "declining" the

contested language pursuant to 25 U.S.C. § 5321(a)(2) and 22 C.F.R. § 900.22(e).[5] *Id.*, Ex. L.

The BIA's partial declination of the proposed funding and its removal/declination of the

contested language are the subjects of *Navajo Nation VI*.

6. <u>The 2020 AFA (*Navajo Nation VII*)</u>

On September 30, 2019, the Nation submitted its proposed 2020 AFA for the 2017

renewed contract to the BIA, with proposed funding of $17,055,477. *Id.*, Ex. M. The BIA

declined all funding above the 2019 amount of $1,460,349 pursuant to 25 C.F.R. § 900.22(d).

*Id.*, Ex. N.

The BIA also announced that, pursuant to 25 U.S.C. § 5329, it had also removed the

same language from Sections B and D of the 2020 AFA as it had the previous year. It again

asserted that these provisions conflict with the Anti-Deficiency Act but added that it would not

agree to the provisions even if they did not conflict with the Act. *See id.* The BIA also sent the

---

[5] 25 U.S.C. § 5321(a)(2) and 22 C.F.R. § 900.22(e) provide that the Secretary may decline a
proposal (or a part thereof) that is beyond the scope of the ISDEAA because it includes activities
that cannot lawfully be carried out by the contractor.

Nation a separate letter directly addressing its objections to the requested language. *See id.*, Ex. O. The BIA's partial declination of the proposed funding and its removal of the contested language are the subjects of *Navajo Nation VII*.

## II.   LEGAL STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense." Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination. An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248) (citation omitted). The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S.

at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor."). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.    ANALYSIS

### A. <u>Annual Funding</u>

Unlike in *Navajo Nation I*, there is no dispute that the BIA timely issued its partial declination decisions on each of the proposed AFAs at issue. Instead, the dispute centers on whether those partial declinations were legally authorized where they approved AFAs less than the amount awarded for 2014. The Nation makes two arguments for why BIA's partial declinations were unlawful. First, it argues that the BIA violated the ISDEAA by funding the 2015 through 2020 AFAs below the "Secretarial level." Pl.'s Mot. at 8-10. Second, the Nation contends that BIA violated DOI regulations by declining the 2015 through 2020 AFAs that are substantially the same as the 2014 AFA. *Id.* at 10-11. There are no material facts in dispute as to either of these issues. But both present close questions of law on which there is a dearth of case law and guidance.

The court starts with the statute "and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Assn. v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). The ISDEAA permits an agency to decline a

proposed AFA only in limited circumstances, one of which is when the "amount of funds proposed under the contract is in excess of" the amount the agency "would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract," as well as certain "contract support costs."  25 U.S.C. §§ 5321(a)(2)(D), 5325(a)(1), (2); *accord* 25 C.F.R. § 900.22.  As previously noted, this is commonly referred to as the "Secretarial amount," which equates to a funding floor.  *See Navajo Nation I*, 852 F.3d at 1130.

The parties dispute whether the increased funding award for 2014 raised the funding floor for succeeding years.  The Nation contends that the 2014 award increased the Secretarial amount to $17,055,517 and that the BIA was thus required to provide at least that much funding in each subsequent year under both the 2012 and 2017 contracts.  Defendants argue that the Secretarial amount is not determined simply by looking to a prior year's award, but rather by considering what amount the BIA "would have otherwise provided for the operation of the programs" at issue if the agency had continued to provide the service itself.  On this point, the court agrees with Defendants.

The record shows that in 2014, the BIA would not have provided $17,055,517 to operate the Nation's judicial program.  On November 7, 2013, it sent the Nation a letter explaining its concerns with the substantial increase in proposed funds from the 2013 agreement and stating that the BIA would "hold the approval" of the Proposal until the Nation submitted certain documents justifying the need for that substantial increase, to which the Nation did not respond. *Navajo Nation I*, 852 F.3d at 1127.  On January 15, 2014, which the BIA believed to be "the last day of the 90-day window," the agency "sent the Nation a letter partially declining the proposal. The BIA authorized approximately $1.3 million in funding rather than the approximately $17 million requested."  *Id.* at 1127.  Though its partial declination was untimely, and the proposed

AFA was "deemed approved," the BIA's intent was clear: it "would have otherwise provided" $1,292,532 in annual funding had the agency retained responsibility for administering the programs itself.  25 U.S.C. § 5325(a)(1).  Accordingly, the court finds that the Secretarial amount in 2014 was $1,292,532, and thus, the BIA's partial declinations of each of the AFAs proposed from 2015 through 2020, which did not go below that funding floor, did not run afoul of 25 U.S.C. § 5325(a)(1).

The Nation's second argument, however, which focuses on DOI regulations, fares better than its first.  The Nation argues that the 2015 through 2020 AFAs were substantially the same as the 2014 AFA, and thus, DOI regulation 25 C.F.R. § 900.32 required BIA to grant those subsequent proposals.  That regulation states:

> **Can the Secretary decline an Indian tribe or tribal organization's proposed successor annual funding agreement?**
>
> No. If it is substantially the same as the prior annual funding agreement (except for funding increases included in appropriations acts or funding reductions as provided in section 106(b) of the Act) and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement. Any portion of an annual funding agreement proposal which is not substantially the same as that which was funded previously (e.g., a redesign proposal; waiver proposal; different proposed funding amount; or different program, service, function, or activity), or any annual funding agreement proposal which pertains to a contract with an agency of DOI other than the BIA, is subject to the declination criteria and procedures in subpart E. If there is a disagreement over the availability of appropriations, the Secretary may decline the proposal in part under the procedure in subpart E.

25 CFR § 900.32 (emphasis in original).

The Nation argues that 25 CFR § 900.32 should be interpreted to apply in instances where, as here, the "prior annual funding agreement" was "deemed approved."  Defendants construe section 900.32 to apply only to "successor AFAs that are substantially the same as prior AFAs *to which the parties agreed*."  Defs.' Mot. at 13 (emphasis in original).  According to

Defendants, because the parties did not reach "agreement" on the proposed 2014 AFA, the

"deemed approval" should not tie the agency's hands in all subsequent years.  On this point, the

court partially agrees with the Nation.

The D.C. Circuit has explained that "a regulation must be interpreted so as to harmonize

with and further and not to conflict with the objective of the statute it implements.  Courts

must construe regulations in light of the statutes they implement, keeping in mind that where

there is an interpretation of an ambiguous regulation which is reasonable and consistent with the

statute, that interpretation is to be preferred."  *Sec'y of Lab., Mine Safety & Health Admin. v. W.*

*Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990) (internal marks omitted).  Accordingly, the

court views 25 CFR § 900.32 in light of the statute it implements, and Congress's direction that

"each provision of [the ISDEAA] and each provision of a contract or funding agreement shall be

liberally construed for the benefit of the Indian Tribe participating in self-determination, and any

ambiguity shall be resolved in favor of the Indian Tribe."  25 U.S.C. § 5321(g); *see also* 25

C.F.R. § 900.3(a)(5) ("[E]ach provision of the Act and each provision of contracts entered into

thereunder shall be liberally construed for the benefit of . . . tribal organizations."); *Montana v.*

*Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (noting that "statutes are to be construed

liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit"); *Ramah*

*Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996) (noting that the ISDEAA is

designed to "circumscribe as tightly as possible the discretion of the Secretary").

Here, "the statutory scheme restricts the Secretary's ability to reduce funding from one

year to the next.  The Secretary may not decline 'any portion of a successor annual funding

agreement,' if 'it is substantially the same as the prior annual funding agreement.'"  *Seneca*

*Nation of Indians v. U.S. Dep't of Health & Hum. Servs.*, 144 F. Supp. 3d 115, 117 (D.D.C.

2015) (quoting 25 C.F.R. § 900.32).  "Section 900.32 affords no discretion to the [BIA]

Secretary to decline or approve such a proposal. When faced with such a proposal, the

Secretary's duty is clear: he or she "shall approve and add to the contract the full amount of

funds to which the contractor is entitled, and may not decline, any portion of a successor annual

funding agreement."  *Navajo Health Found.-Sage Mem'l Hosp., Inc v. Burwell*, 220 F. Supp. 3d

1190, 1256 (D.N.M. 2016).

       Defendants argue that section 900.32 does not apply because the 2014 AFA was not a

"prior annual funding agreement" because it was not a "negotiated agreement."  *See* Defs.' Mot.

at 13; 25 C.F.R. 900.6 (defining AFAs as a "negotiated agreement").  That argument is

unpersuasive.  The regulation's plain language, paired with the undisputed facts, suggests that

the 2014 AFA was negotiated.  Black's Law Dictionary defines "negotiate," in the relevant

sense, as either "to discuss or arrange a sale or bargain," or "to arrange the preliminaries of a

business transaction."  Black's Law Dictionary, http://thelawdictionary.org/negotiate/.  "Notably

absent from the definition is any requirement that the discussion or arrangement must be (i)

brought to a successful completion; or (ii) end on a mutually satisfactory note.  Seen through a

philosophical or philological lens, a negotiation is either a process or a system for decision

making rather than an end state."  *Navajo Health Found.-Sage Mem'l Hosp.*, 220 F. Supp. 3d at

1258.  And though the 2014 AFA was "deemed approved," it nonetheless constitutes an

agreement pursuant to 25 C.F.R. §§ 900.18 and 900.19 and a "prior annual funding agreement"

under section 900.32.  To hold otherwise would lead to an "inescapable paradox" whereby an

AFA "deemed approved" would be considered an annual funding agreement for some purposes,

but not an annual funding agreement for others.  *See id.* (holding that section 900.32 applies to

prior funding agreement "deemed approved").

Moreover, Section 900.32 is not limited to circumstances in which the prior AFA was funded at the Secretarial amount. On its face, it applies equally to circumstances such as this one, where the prior AFA was funded at a level above the Secretarial amount. *See Navajo Nation I*, 852 F.3d at 1130 (explaining that the Secretarial amount is a floor, not a ceiling); *Seneca Nation of Indians*, 144 F. Supp. 3d at 117) ("Secretarial amount is not immutable and can be increased by the Secretary").

Construing the ISDEAA and implementing regulation "liberally . . . for the benefit of the [Nation]," and resolving any ambiguity in favor of the Nation, the court finds that the 2014 AFA was a "prior funding agreement," and that the BIA was not permitted to decline successor funding agreements to the extent they sought the same amount of funding for substantially the same purpose.

Section 900.32's import, however, extends only to "successor funding agreements" entered into under the same "contract." *See* 25 C.F.R. § 900.32; *see also* 25 U.S.C. § 5329(c) (annual funding agreements are incorporated by reference into the effective self-determination contract). As previously noted, the six consolidated cases straddle two successive self-determination contracts. The first was effective from 2012 through 2016, and the second from 2017 through 2021. *Navajo Nation II* and *III* concern partial declinations of the Nation's 2015 and 2016 proposed AFAs, each of which succeeded the 2014 AFA as part of the 2012 contract. *Navajo Nation IV*, *V*, *VI*, and *VII*, on the other hand, concern partial declinations incorporated into the 2017 renewed contract, and thus the court finds that the 2017 through 2020 AFAs are not "successor funding agreements" to the 2014 AFA.[6]

---

[6] The Nation concedes that section 900.32 does not apply to BIA's approval of the 2017 renewed contract and 2017 AFA. *See* Pl.'s Opp'n and Reply at 11. Instead, it argues that a different provision of the regulation, section 900.33, requires the BIA to fund proposed AFAs at the same level as AFAs in prior self-determination contracts. Section 900.33, however, is inapposite as it

Finally, the court considers whether the 2015 and 2016 proposed AFAs are "substantially the same" as the 2014 AFA that was "deemed approved," and finds that they are. *Compare* Defs.' SMF, Ex. B (proposed 2014 AFA), *with* Pl.'s SMF, Ex. A (proposed 2015 AFA); *id.* Ex. D (proposed 2016 AFA). To be sure, the 2015 proposed AFA seeks funding that exceeds the 2014 award. BIA has discretion to enter partial declinations as to the portion of the 2015 AFA that exceeds the 2014 award, to the extent the Secretary "would not otherwise provide" those additional funds. *See* ECF No. 21, Pl.'s Opp'n and Reply at 10; Defs.' Mot. at 12 n.3; 25 U.S.C. § 5321(a)(4) ("The Secretary shall approve any severable portion of a contract proposal that does not" qualify for one of the five declination criteria provided in section 5321(2)); 25 C.F.R. 900.32 (explaining that the BIA may decline "any portion" of a proposed AFA which is not substantially the same as that which was previously funded).

Consequently, the court finds that the BIA could not decline the Nation's proposed 2015 and 2016 AFAs to the extent they sought the amount deemed approved for 2014 for substantially the same purpose, minus any across-the-board reductions stemming from a reduction in congressional appropriations under 25 U.S.C. § 5325(b)(2)(A).

**B. <u>Contested Language in AFAs</u>**

The Nation also challenges whether the BIA had the authority to exclude certain language from the 2019 and 2020 AFAs. The Nation proposed the contested language in a substantially similar form, albeit slightly restructured, in 2015, 2016, and 2017, and in each of those years, the BIA accepted it into the AFA. *See* Pl.'s SMF, Exs. A, D, F. The Nation continued to include the language in its 2018, 2019, and 2020 proposed AFAs, *see id.*, Exs. H, J, M, but the agency rejected and removed it from those AFAs, explaining that it had done so "in

---

pertains only to the agency's authority to decline renewal contracts, and not to successor AFAs. *See* 25 C.F.R. § 900.33.

order to comply with the Anti-Deficiency Act," *see id.*, Exs. I, K, M.  In 2019, the agency added

that it was "declining" the contested language pursuant to 25 U.S.C. § 5321(a)(2) and 22 C.F.R.

§ 900.22(e).  *See id.*, Ex. L.  In 2020, the BIA abandoned that justification, stating that it would

not agree to the contested language even if it did not conflict with the Act.  *See id.*, Exs. M, O.

      The Nation argues that the BIA's justifications for removing the language have no legal

basis, and that in any event, the agency lacks authority to unilaterally remove language to which

the parties previously agreed and codified in prior AFAs.  Defendants contend that the disputed

language is not one of the provisions required by the model agreement set forth at section 5329

of the ISDEAA, and that the only other provisions that may be included in AFAs are those "to

which the parties agree."  25 U.S.C. § 5329(c) (Model Agreement § (f)(2)(A)).  The court again

agrees with the Nation.

      As an initial matter, the court disagrees with the BIA's contention that it could remove

the contested language because it violates the Anti-Deficiency Act.  That Act "prohibits

government officials and employees from making expenditures or incurring obligations in excess

of available appropriations or in advance of appropriations."  *Cessna Aircraft Co.*, 126 F.3d at

1449.  It "restricts the ability of the government to enter into multi-year contracts because funds

generally cannot be obligated beyond the current fiscal year."  *Id.*  By their terms, AFAs only

establish funding for one year, subject to the availability of appropriations.  *See* 25 U.S.C. §

5329(c) (Model Agreement § 1(b)(4)).  Thus, AFAs neither obligate funds in excess of

appropriations nor constitute impermissible multi-year contracts.

      Furthermore, the specific language at issue here imposes no financial obligation on the

BIA and therefore cannot trigger a violation of the Anti-Deficiency Act.  The contested language

simply commits the DOI and the BIA to make a good faith effort, subject to applicable law, to

identify funds or to obtain an appropriation to address any shortfall incurred by the Nation.  It does not commit the DOI to make any expenditure or incur any obligation that exceeds available appropriations; it only commits the BIA to make lawful efforts to address a shortfall.

Defendants, perhaps recognizing the Act's inapplicability, now plead that "the Nation's arguments regarding the proper interpretation of the Anti-Deficiency Act are simply a red herring with which the Court need not engage."  *See* Defs' Mot. at 17.  The court declines Defendants' request to avoid the issue and rejects the BIA's contention that the contested language would violate the Anti-Deficiency Act.

The court next considers the BIA's rationale for removing the contested language from the 2019 AFA—that the language required certain activities that cannot lawfully be carried out by the contractor.  DOI regulations define the "contractor" as the Nation, *see* 22 C.F.R. § 900.6, and the contested language only requires certain actions from the BIA, *see* Pl.'s SMF, Exs. H, J, M.  Accordingly, Defendants' argument that the contested language requires unlawful activities by the *contractor* is meritless.  Defendants now appear to concede the point, describing the BIA's position as "inartful language."  *See* Defs.' Mot. at 18 n.4.  Consequently, the court also rejects this justification for removing the contested language.

Finally, Defendants argue that AFAs can only include provisions that are specified in the ISDEAA's model agreement or that are agreed to by the parties.  The model agreement at section 5329 of the ISDEAA provides that AFAs "shall only contain . . . terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment."  25 U.S.C. § 5329(c) (Model Agreement § (f)(2)(A)).  Beyond those categories, the only provisions to be included in AFAs are those "to which the parties agree."  *Id.*

Defendants argue that because the contested language is not one of the provisions envisioned in the model agreement or one "to which the parties agree," they were permitted to remove it from the 2018 through 2020 AFAs.

Defendants are correct that inclusion of the contested language in an AFA required the BIA's agreement.  But Defendants ignore the fact that the BIA previously agreed to include the contested language in the 2015, 2016, and 2017 AFAs.  *See* Pl.'s SMF, Exs. A, D, F.  Thus, the question is whether the BIA could change its mind and unilaterally delete the language from the 2018, 2019, and 2020 AFAs.  It could not.

The ISDEAA does not empower the BIA to "remove" any language from an AFA. Rather, the Act authorizes the BIA to "decline" part of a proposal, but only if one of five statutory grounds for declination exists.  *See* 25 U.S.C. § 5321(a)(2); *supra* footnote 2.  None of those exceptions apply here.

Moreover, the BIA "must approve an AFA unless it is not 'substantially the same as the prior annual funding agreement.'"  *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 9 (D.D.C. 2008) (quoting 25 C.F.R. § 900.32).  "Therefore, no agency employee may insist on the inclusion or deletion of any provision in a successor AFA as a condition for its approval, unless there has been a change in law or in regulations which require such amendment."  DOI/IHS *Internal Agency Procedures Handbook for Non-Construction Contracting Under Title I of the Indian Self-Determination and Education Assistance Act*, Chap. 5, § III.F.1.b (1999).  No such change in law or in regulations has occurred here.

Ultimately, Defendants provide no basis on which the BIA could lawfully remove the language at issue from the 2019 and 2020 AFAs.

**C.  <u>Remedy</u>**

The ISDEAA provides a comprehensive range of remedies that the court may grant, including money damages, injunctive relief, and an order reversing a declination finding and compelling the Secretary to fund a self-determination contract.  *See* 25 U.S.C. § 5331(a). Because the ISDEAA specifically provides for both injunctive and mandamus relief to remedy violations of the Act, a tribe need not demonstrate the traditional equitable grounds for obtaining that relief.  *See Navajo Health Found.-Sage Mem'l Hosp.*, 220 F. Supp. 3d at 1222-23.

In *Navajo Nation I*, following the Circuit's reversal, this court granted the Nation's motion for summary judgment, ordered that the Nation's proposed 2014 AFA was "deemed approved," and awarded damages for breach of contract in the amount of $15,762,985, in addition to interest on that amount pursuant to 41 U.S.C. § 7109.  *See* Order, *Navajo Nation I*, 14-cv-1909 (TSC) (D.D.C. June 16, 2020) (finding that such judgment was facially reasonable), ECF No. 48.  The court will follow a similar approach here.

With regards to Defendants' unlawful removal of language from the 2019 and 2020 AFAs, the Nation is entitled to declaratory relief in *Navajo Nation VI* and *VII* that the contested language in Sections B and D of those respective AFAs is lawful, and injunctive relief compelling the BIA to restore the language in those AFAs.

## IV.    CONCLUSION

For reasons explained above, the court will GRANT IN PART and DENY IN PART the Nation's motion for summary judgment and will GRANT IN PART and DENY IN PART Defendants' cross-motion for summary judgment in this consolidated case.

The court will GRANT the Nation's motion and DENY Defendants' cross-motion as to the Nation's claims in *Navajo Nation II* and *III* that Defendants unlawfully declined funding in the 2015 and 2016 AFAs and will award declaratory judgment that the BIA could not decline the

Nation's proposed 2015 and 2016 AFAs to the extent they sought the amount deemed approved for 2014 for substantially the same purpose.  The court will award damages for breach of contract in the amount of $15,759,069 plus interest in *Navajo Nation II*, and $15,619,176 plus interest in *Navajo Nation III*.

However, the court will DENY the Nation's motion and GRANT Defendants' cross-motion as to the Nation's claims in *Navajo Nation IV*, *V*, *VI*, and *VII* that Defendants' unlawfully declined funding in the 2017, 2018, 2019, and 2020 AFAs.

The court will GRANT the Nation's motion and DENY Defendants' cross-motion as to the Nation's claims in *Navajo Nation VI* and *VII* that Defendants unlawfully removed language from the 2019 and 2020 AFAs.  The court will award declaratory relief in *Navajo Nation VI* and *VII* that the contested language in Sections B and D of the 2019 and 2020 proposed AFAs is lawful, and injunctive relief compelling the BIA to restore the language in those AFAs.

The court will dismiss *Navajo Nation II* through *VII* with prejudice.

Date:  March 21, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge